**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NADINE R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17-cv-08324 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ANDREW MARSHALL SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nadine R. claims that she suffers from anxiety disorder, depression, obsessive compulsive disorder ("OCD"), and post-traumatic stress disorder ("PTSD"), among other mental and physical impairments. She seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. Specifically, Plaintiff claims that the Administrative Law Judge ("ALJ") wrongly weighed the evidence and medical opinions in finding that she was not *per se* disabled and in finding that she had the ability to perform some types of work. Plaintiff thus asks this Court to reverse the ALJ's decision without a remand for rehearing or, alternatively, reverse and remand her case for appropriate proceedings. (Dkt. No. 9.) The Commissioner asks the Court to affirm the ALJ's decision. (Dkt. No. 14.) For the reasons that follow, the Court grants Plaintiff's motion and denies the Commissioner's motion. This case is remanded for further proceedings.

**BACKGROUND**

Plaintiff is a 38-year-old woman who suffers from the following impairments: anxiety disorder, depression, OCD, PTSD, diverticulitis, Raynaud's Disease, attention deficit

hyperactivity disorder, psoriasis, arthritis, and lingering issues from hip and ankle surgery. (Admin. R. at 21–22, Dkt. No. 6-3; *see also id.* at 812, Dkt. No. 6-16.) Due to Plaintiff's impairments, she experiences bouts of rage at family members, coworkers, and even strangers. She has also struggled with suicidal thoughts. Plaintiff first filed an application for disability insurance on February 22, 2012. (*Id.* at 18, Dkt. No. 6-3.) When the application was denied, she did not pursue the application further. (*Id.*) Her subsequent application in March 2014 and final denial in December 2016 are the subject of the present case.

## I.      Plaintiff's Medical and Employment History

Plaintiff's medical record reveals that she grew up in a chaotic family environment. Her father had a history of being physically abusive and Plaintiff herself fought with her brother. (Admin. R. at 902, Dkt. No. 6-17.) At age nine, she started engaging in obsessive compulsive behavior, like taking repeated showers and ritually moving objects. (*Id.* at 901.) Plaintiff's physical health issues began at a young age. She dislocated her left hip at the age of ten and received a hip replacement when she was 21. (*Id.* at 902.) Plaintiff was diagnosed with the blood vessel disorder Raynaud's disease at the age of fourteen. (*Id.*) When she was in her twenties, she was diagnosed with the intestinal disease diverticulitis and the joint disease psoriatic arthritis. (*Id.*)

Notwithstanding her mental and physical issues, Plaintiff earned a Bachelor of Arts at Carroll College in Wisconsin in 2005 after studying organizational communication and business. (*Id.*) She last held a stable job in February 2011, when she worked as a food investigator at G4S in Arizona. (*Id.* at 46, Dkt. No. 6-3.) She left after being hospitalized for kidney stones, but she also testified that she could not control her anger against her supervisor anymore. (*Id.* at 46–47.)

Plaintiff began going through a bitter divorce in 2012. (*Id.* at 812, Dkt. No. 6-16.) She reported to medical providers that her husband was physically abusive towards her. (*Id.* at 901,

Dkt. No. 6-17.) Plaintiff described him as a sex addict who hit and pushed her when she confronted him about his cheating. (*Id.*) In June 2012, she moved back to Illinois to live with her mother. (*Id.* at 812, Dkt. No. 6-16.) Months later, in January 2013, Plaintiff's mother called for an ambulance after Plaintiff threatened "to get a gun and end it all" or cut her wrists with scissors. (*Id.* at 708, Dkt. No. 6-14.) Police and paramedics took Plaintiff to St. Alexius Medical Center in Hoffman Estates, Illinois. (*Id.*) Given her suicide threats, the staff committed Plaintiff involuntarily for around one week.[1] (*Id.* at 812, Dkt. No. 6-16.) After that, she received outpatient care until April 2013, but she stopped participating because she could no longer afford counseling. (*Id.* at 25, Dkt. No. 6-3.) Plaintiff later told a healthcare provider that she "was drinking way too much in 2013." (*Id.* at 903, Dkt. No. 6-17.)

The following year, in April 2014, Plaintiff sought counseling at Community Counseling Centers of Chicago and reported that she was no longer taking her psychiatric medication because she could not afford it. (*Id.* at 866–67, Dkt. No. 6-16.) However, she was smoking marijuana daily to manage pain. (*Id.* at 867.) A doctor at the counseling center gave Plaintiff a new prescription. (*Id.* at 884.) The intake assessment of Plaintiff noted that she was then living with her boyfriend, but they were having problems. (*Id.* at 867, 869.) The form states that she was "otherwise homeless" and was receiving social services from Journeys the Road Home, a non-profit that assists homeless individuals and those at risk of becoming homeless. (*Id.* at 866, 869; *see also id.* at 63, Dkt. No. 6-3.) Plaintiff met with licensed social worker Michelle Dubil at Journeys the Road Home for several months. (*See id.* at 705, Dkt. No. 6-14; *id.* at 1076–79, Dkt. No. 6-19.)

---

[1] The ALJ decision mentions that Plaintiff was "involuntarily committed in January of 2012 for approximately one week." (Admin. R. at 23, Dkt. No. 6-3.) Elsewhere, the ALJ writes, "[i]n January of 2013, the claimant was admitted to the hospital following allegations of suicidal ideations, but stated to medical providers that she was angry with her mother and not actually suicidal." (*Id.* at 25.) Based on the Court's review of the record, it appears that the ALJ was referring to only one incident, which took place in January 2013. (*See id.* at 496–516, Dkt. No. 6-11.)

In May 2014, a few months after Plaintiff submitted her second application for disability benefits (which is the subject of her present appeal), Matthew Galloucis, Ph.D., performed a consultative examination of her on behalf of the Social Security Administration ("SSA"). (*Id.* at 892, Dkt. No. 6-16.) After a one-hour in-person interview and review of her medical records, Dr. Galloucis found that Plaintiff did not show any major mental impairments, such as hypomanic thinking or memory issues, but diagnosed her with bipolar disorder and alcohol and cannabis abuse. (*See id.* at 892–98). In June 2014, Plaintiff stopped going to therapy at Community Counseling Centers of Chicago due to a lack of motivation, though her providers noted that she had still not met her therapeutic goals. (*Id.* at 1002–09, Dkt. No. 6-18.)

Plaintiff next sought psychological care in October 2014, when she started seeing a therapist at Maine Center Inc., a medical group in Park Ridge, Illinois. (*Id.* at 1182–86, Dkt. No. 6-21.) Plaintiff also received a psychiatric evaluation at Maine Center and, on November 5, 2014, a provider prescribed her new medications to treat bipolar disorder. (*See id.* at 1164–67.) The provider revised Plaintiff's medication list on December 3, 2014, then again on January 10, 2015, and for a third time on February 7, 2015. (*Id.* at 1159, 1161, 1163.) Plaintiff reported that she was feeling "60% better," and on March 7, 2015, the provider declined to make any further changes to her prescriptions. (*Id.* at 1156–58.)

Sometime between December 2014 and March 2015, Plaintiff worked on the night shift at the front desk of a hotel, but she left the job in fewer than ten days. (*Id.* at 1156; *id.* at 25–26, Dkt. No. 6-3.) There are some inconsistencies in the record concerning this job. According to the ALJ, Plaintiff worked at the hotel sometime in March 2015. (*Id.* at 25–26, Dkt. No. 6-3.) This timing is corroborated by contemporaneous psychiatric notes. (*Id.* at 1156, Dkt. No. 6-21.) Plaintiff testified that she left the job because she could not control her anger at customers, coworkers, and the

hotel's owner. (*Id.* at 50–51, Dkt. No. 6-3.) A January 2016 psychiatric evaluation noted that she had worked at the hotel front desk in December 2014 and that she had quit or been fired because she could not keep up with the work. (*Id.* at 1122–23, Dkt. No. 6-20.) Plaintiff's testimony did not specify whether she quit the job or was let go. (*Id.* at 50–51, Dkt. No. 6-3.)

The Maine Center, where Plaintiff had been seeing mental health providers, closed sometime in early 2015; in November of that year, Plaintiff sought treatment at the Kenneth Young Center in Elk Grove Village, Illinois. (*Id.* at 1122–35, Dkt. No. 6-20.) As of August 15, 2016 (the date of Plaintiff's administrative hearing), she was still going to the Kenneth Young Center for mental healthcare. (*Id.* at 45, Dkt. No. 6-3.) Plaintiff engaged in weekly therapy there with mental health professional Brian Trager. (*Id.* at 1126–33, Dkt. No. 6-20.) In May 2016, Trager filled out a case report stating that Plaintiff suffered from bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), OCD, and chronic pain. (*Id.* at 1154–55.) Next to a list of possible situations that trigger Plaintiff's symptoms, Trager checked: encounters with other people; encounters with groups of people; coping with supervisors, coworkers, and public; dealing with family; and travel (leaving the home environment). (*Id.* at 1154.) Trager wrote that due to Plaintiff's past trauma, "she stays at home almost every day all day to avoid daily activities." (*Id.*) He also explained that because of her paranoia, Plaintiff was "extremely restricted in her socialization with others." (*Id.*)

A psychiatrist at the Kenneth Young Center, John F. Egger, M.D., also evaluated Plaintiff in January 2016. (*Id.* at 1122–24.) Dr. Egger disagreed with Plaintiff's previous diagnoses of bipolar disorder, finding that she did not have a history of mania or grandiosity except when she was taking high doses of Adderall. (*Id.* at 1124.) Dr. Egger attributed any manic symptoms to Plaintiff's Adderall use rather than bipolar disorder. (*Id.*) He instead diagnosed Plaintiff with

substance induced mood disorder, major depressive disorder, cannabis dependence, and alcohol abuse. (*Id.*) Dr. Egger prescribed her several medications that were largely consistent with those she had taken in the past. (*Id.*) In March 2016, he increased the dose of one of her medications. (*Id.* at 1134.)

## II.     Hearing Testimony

Plaintiff's disability claim was initially denied on June 27, 2014. (Admin. R. at 18, Dkt. No. 6-3.) Her appeal for reconsideration was denied on November 5, 2014, and the following month, Plaintiff filed a written request for a hearing. (*Id.*) Plaintiff appeared at a hearing before an ALJ on August 15, 2016 in Oak Brook, Illinois. (*Id.* at 40.) Plaintiff testified, followed by impartial medical expert Ellen Rozenfeld, Psy.D., and impartial vocational expert Lee O. Knutson. (*Id.*)

At the hearing, Plaintiff testified that she was living with her mother in Hoffman Estates, Illinois, where she had lived for three years since returning from Arizona. (*Id.* at 43–44.) She clarified that she had also been living with her boyfriend "on and off." (*Id.* at 44.) When asked how she spent her days at home, Plaintiff testified that when she woke up in the morning, she fed and let out her emotional support dog, and then spent most of the day on the couch in front of the television. (*Id.* at 48–49.) However, Plaintiff also remarked that she had difficulty concentrating, so she often watched the same television program during the day and again at night. (*Id.* at 49, 53.) Plaintiff mentioned that she previously had issues with obsessive cleaning, but lately her physical impairments prevented her from cleaning as obsessively as before. (*Id.* at 54.) Plaintiff testified that she recently learned she was pregnant, and that she had quit using marijuana and alcohol shortly before discovering the pregnancy. (*Id.* at 44–46.) Due to her pregnancy, her healthcare providers also had to take her off of a number of her medications. (*Id.* at 44–45.)

6

A repeated theme of Plaintiff's hearing testimony concerned her problems interacting with others. For instance, she testified that when she drove, she often experienced feelings of road rage towards other drivers. (*Id.* at 52.) She also provided an anecdote about a grocery shopping trip during which the store clerk was having trouble ringing up the items underneath her cart. (*Id.*) Plaintiff testified that, when an employee stopped her on her way out of the store, "[she] started getting angry and raising my voice and [she] noticed that everybody was stopping and looking at [her] and then [she] started shaking." (*Id.*) Plaintiff stated that she "threw the money" at the grocery employee and left the store immediately because she "couldn't handle it." (*Id.*) Plaintiff also testified that she did not have any friends because she does not want people to know anything about her. (*Id.* at 53.) When asked about her history with physical altercations, Plaintiff testified that she has previously had physical fights with her brother, her ex-husband, and, at times, strangers, but she did not elaborate. (*Id.*)

Dr. Rozenfeld testified next. She briefly summarized Plaintiff's medical history and concluded that Plaintiff did not suffer from any significant cognitive impairments—either with respect to her memory or her concentration. (*Id.* at 61–62, 67.) Though Dr. Rozenfeld opined that social interactions were a serious limitation for Plaintiff, Dr. Rozenfeld did not see significant documented medical evidence that Plaintiff struggled with frequent outbursts of rage at others. (*Id.* at 67.) Dr. Rozenfeld agreed with Dr. Egger's evaluation that Plaintiff suffered from substance abuse and major depressive disorder but not bipolar disorder (*Id.* at 59–61.) As to the criteria relevant in social security eligibility determinations, Dr. Rozenfeld concluded that Plaintiff had only mild limitation in her activities of daily living; moderate limitation in concentration, persistence, or pace; moderate limitation in her social functioning; and only one period of decompensation—or regression in her coping mechanisms—when she was involuntarily

committed in January 2013 after threatening suicide. (*Id.* at 69–70.) Overall, Dr. Rozenfeld opined that Plaintiff could work in proximity to other people and handle routine supervision, but she could not work directly with coworkers or interact with the public. (*Id.* at 70–71.)

Knutson, the vocational expert, testified after Dr. Rozenfeld. He opined that Plaintiff did not have the residual functioning capacity ("RFC") to perform any of her past jobs, as they all involved too much social interaction. (*Id.* at 74–75.) But he suggested that Plaintiff could obtain other nationally available work as a non-postal mailroom clerk, housekeeper, inspector, checker, or weigher. (*Id.*)

### III.    ALJ Opinion

On December 12, 2016, the ALJ issued a decision finding that Plaintiff did not qualify for disability insurance benefits because she was not disabled. (Admin. R. at 18–32, Dkt. No. 6-3.) To determine whether a claimant is disabled, the ALJ must go through a five-step sequential inquiry to determine: (1) whether the claimant is gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairments are severe enough to meet the regulatory criteria set out in Appendix 1 to 20 C.F.R. § 404.1520(a)(4)(iii) ("Appendix 1 Criteria"); (4) the claimant's RFC and whether, given her RFC, she could perform her past relevant work; and (5) whether the claimant can make an adjustment to perform other work, considering her RFC, age, education, and experience. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).

At Step One, the ALJ determined that Plaintiff was not gainfully employed during the relevant period from February 1, 2011 through her date last insured, September 30, 2016. (Admin. R. at 20–21, Dkt. No. 6-3.) At Step Two, the ALJ found that Plaintiff had the following severe impairments: anxiety disorder, depression, OCD, PTSD, diverticulitis, Raynaud's disease, and

8

ADHD. (*Id.* at 21.) But the ALJ also dismissed several of Plaintiff's ailments as not severe, including her psoriasis, arthritis, abuse of marijuana and alcohol, and lingering issues from her hip and ankle surgery. (*Id.*) At Step Three, the ALJ determined that none of Plaintiff's mental or physical impairments met or exceeded the regulatory Appendix 1 Criteria. (*Id.* at 22–24.) Most relevantly, under 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00, the ALJ determined that Plaintiff's mental impairments did not meet the required "Paragraph B" criteria under any category of mental illness.

To find that Plaintiff satisfied Paragraph B under the Appendix 1 Criteria in place at the time of his decision, the ALJ had to find at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated periods of decompensation of an extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02(B) (effective Sept. 29, 2016 to Jan. 16, 2017).[2] The regulations defined an episode of decompensation as an exacerbation in symptoms marked by a loss of adaptive functioning. *Id.* § 12.00(C)(4). The ALJ found that Plaintiff had "no difficulties" in her activities of daily living, noting that she took care of her personal grooming and prepared small meals for herself. (Admin. R. at 22–23, Dkt. No. 6-3.) The ALJ determined that Plaintiff had only moderate difficulties in social functioning and was capable of some appropriate interactions with others. (*Id.* at 23.) Specifically, the ALJ noted that Plaintiff

---

[2] Since the ALJ's decision in this case, the relevant regulatory criteria have been amended. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (effective Mar. 14, 2018). The amended Appendix 1 Criteria for mental illnesses are substantively different than those in place when the ALJ issued this decision on December 12, 2016. For instance, the current regulations eliminate the "episodes of decompensation" criterion entirely. *See id.* § 12.04. Thus, in reviewing the ALJ's decision, the Court looks to the Appendix 1 Criteria effective as of the date it was issued. *See McCammond v. Colvin*, No. 15 C 6589, 2016 WL 3595736, at *2 (N.D. Ill. July 5, 2016) (explaining that regulations which post-date the ALJ's decision should only be applied on appeal "where the new regulation or Ruling is a clarification of existing law rather than a change to it" (citing *Pope v. Shalala*, 998 F.2d 473, 482–83 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 563 (7th Cir. 1999))).

had some successful personal relationships, including relationships with her father and her boyfriend. (*Id.*) He highlighted that recent treatment records described her as "cooperative and engaged" in therapy, and that she reported no difficulties with casual interactions like grocery shopping, despite her contradictory hearing testimony. (*Id.*) As to Plaintiff's concentration, persistence, or pace, the ALJ found that she had only moderate difficulties. (*Id.*) The ALJ acknowledged that her therapists described her as having impaired judgment, but that exams of her mental capacity had not shown any significant difficulties. (*Id.*) He thus concluded that she could maintain concentration, persistence, or pace "at times." (*Id.*) Finally, the ALJ found that Plaintiff had experienced only one period of decompensation of extended duration: when she was involuntarily committed for one week in January 2013. (*Id.* at 23.)

Having determined that Plaintiff did not meet the Appendix 1 Criteria, which would have deemed her presumptively disabled, *see Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020), the ALJ moved on to Step Four. The ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with certain alterations.[3] (Admin. R. at 24, Dkt. No. 6-3.) Most relevant to this Opinion, with respect to Plaintiff's mental and social abilities, the ALJ found that she could understand, remember, and carry out detailed instructions; and while she could not be required to interact with the public or work on joint projects with coworkers, she could work in

---

[3] In full, the ALJ made the following finding with respect to Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except the claimant could only occasionally climb of [*sic*] ramps and stairs, and never climb ladders, ropes, or scaffolds. The claimant can engage in balancing, stopping, and crawling unlimitedly, but only frequently kneel and crouch. The claimant can understand, remember, and carry out detailed instructions. In addition, the claimant cannot be required to interact with the public, and although the claimant can be in close proximity to coworkers, she cannot work on joint projects in a workplace setting with routine changes and tasks.

(Admin. R. at 24, Dkt. No. 6-3.)

close proximity to coworkers. (*Id.*) In reaching this decision, the ALJ noted certain inconsistencies in Plaintiff's statements. For instance, the ALJ pointed out that she testified she left her job as a hotel clerk because she fought with coworkers, despite having told a healthcare provider that she could not keep up with the work. (*Id.* at 26.) The ALJ also expressed skepticism about Plaintiff's testimony that she was able to control her outbursts in doctor's and therapy appointments (because she wanted to avoid constantly changing providers) but not in the workplace. (*Id.*) Overall, the ALJ found Plaintiff's testimony inconsistent with the testimony of medical experts and with other evidence in the record.

In defining Plaintiff's RFC, the ALJ clearly stated that he was giving great weight to the evaluations submitted by the state medical consultant, Dr. Charles Kenney, M.D., and the state psychological consultant, Howard Tin, Psy.D., both of whom determined that Plaintiff was not disabled. (*Id.* at 27.) The ALJ also gave great weight to the hearing testimony of Dr. Rozenfeld and the report submitted by the state consultant Plaintiff met in person, Dr. Galloucis. (*Id.*) With respect to Plaintiff's physical health conditions, the ALJ gave great weight to the opinion of the consultative examiner Jorge Aliaga, M.D., who had found that she had no significant physical limitations. (*Id.* at 28.) The ALJ gave only partial weight to the opinions of state medical consultant Calixto Aquino, M.D. and state psychological consultant Donald Henson, Ph.D., finding their 2014 reports outdated. (*Id.*)

The ALJ explained that he afforded little weight to the reports of Plaintiff's therapist, Brian Trager, who worked with Plaintiff for more than a year. (*Id.* at 28–29.) The ALJ dismissed Trager's description of Plaintiff's mental and social difficulties as "extreme" and inconsistent with the rest of the record. (*Id.*) The ALJ also emphasized that Trager was not a medical professional. (*Id.*) Similarly, the ALJ assigned little weight to the reports of Plaintiff's social worker, Michelle

Dubil, pointing out that she had only treated Plaintiff for three months and lacked any scientific or medical expertise. (*Id.* at 29.)

The ALJ ultimately determined that Plaintiff's RFC prevented her from performing any of her past work. (*Id.* at 30.) However, at Step Five, the ALJ found that there were other nationally available jobs that she could perform, such as mail room clerk, house cleaner, or inspector checker. (*Id.* at 31.)

## DISCUSSION

The Court reviews the ALJ's decision to evaluate whether it is supported by substantial evidence—if it is not, the decision must be reversed. *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may consider the full administrative record in its review but "may not substitute [its] judgment for that of the ALJ by reconsidering the facts, reweighing the evidence or resolving factual disputes." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, while "great deference is accorded to the ALJ's determination, 'we must do more than merely rubber stamp the ALJ's decision.'" *Id.* (internal alterations and citations omitted). The ALJ must sufficiently explain the decision to allow the Court to provide "meaningful judicial review and assess the validity of the agency's ultimate conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856–57 (7th Cir. 2014). "An ALJ need not address every piece of evidence, but he must establish a logical connection between the evidence and his conclusion." *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). With her challenge to the ALJ's disability determination here, Plaintiff argues that he ignored certain evidence in determining that her impairments did not meet the Appendix 1 Criteria, failed to provide sufficient

detail concerning her RFC, improperly disregarded the opinion of her treating physicians, and wrongly discounted her own testimony.[4]

## I.    Appendix 1 Criteria

At Step Three of the sequential analysis, the ALJ must evaluate whether the claimant's impairments are severe enough to meet the regulatory Appendix 1 Criteria. With regard to Plaintiff, the ALJ found that she failed to meet the Appendix 1 Criteria listed under any mental impairment category. The ALJ specifically considered § 12.04, which covers affective disorders such as depression and bipolar disorder. *See* 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04 (effective Sept. 29, 2016 to Jan. 16, 2017). To meet the criteria under § 12.04 (as it was written when the ALJ issued the decision), Plaintiff had to provide medical documentation of at least one persistent symptom listed under Paragraph A and meet the criteria of either Paragraphs B or C. *Id.* Accepting that Plaintiff had met the Paragraph A requirements, the ALJ nonetheless found that she did not display marked limitations in two areas of mental functioning (as required to satisfy Paragraph B) and that she did not meet the two-year duration requirement of Paragraph C. (Admin. R. at 22–24, Dkt. No. 6-3.)

Plaintiff contends the ALJ wrongly determined that she did not meet the Paragraph B criteria and makes no argument as to Paragraph C. The Court thus reviews the ALJ's findings as to each of the four Paragraph B criteria: (1) marked restriction of activities of daily living; (2) marked difficulties in social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated periods of decompensation of an extended duration. 20

---

[4] Though Plaintiff's memorandum briefly mentions that the ALJ dismissed evidence of her ankle and hip impairments in his decision, she dedicates all her argument to challenging the ALJ's findings as to her mental and social difficulties. The Court thus finds that Plaintiff has waived any arguments with respect to the severity of her physical impairments or their impact on her RFC. *See Cadenhead v. Astrue*, 410 F. App'x 982, 984 (7th Cir. 2011) ("Appellants, including those who are *pro se*, must present arguments supported by legal authority and citations to the record. A generalized assertion of error is not sufficient to challenge an adverse ruling, and undeveloped or unsupported contentions are waived." (citations omitted)).

C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02(B) (effective Sept. 29, 2016 to Jan. 16, 2017). As discussed above, a claimant must demonstrate at least two of the four.

### A. Activities of Daily Living

As to the activities of daily living, the ALJ found that Plaintiff had only mild limitations. The ALJ remarked that Plaintiff had reported "no difficulties in this area." (Admin. R. at 22, Dkt. No. 6-3.) And his decision emphasized that Plaintiff took care of her own personal grooming and made herself small meals. (*Id.* at 22–23.) Plaintiff has not provided any argument on this point, and thus waives the argument that the ALJ wrongly discounted any evidence concerning her limitations with regard to daily activities.

### B. Social Functioning

"Social functioning" means the "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals," including "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." *See* 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00(C)(2) (effective Sept. 29, 2016 to Jan. 16, 2017). The ALJ found that Plaintiff had only moderate difficulties in maintaining social functioning and was capable of appropriate casual interactions. (Admin. R. at 23, Dkt. No. 6-3.) Furthermore, although Plaintiff had trouble getting along with other people, she was able to maintain a romantic relationship and a close relationship with her father. (*Id.*) The ALJ also emphasized that Plaintiff's treatment records showed she was cooperative and engaged in her therapy. (*Id.*)

Plaintiff argues that the ALJ ignored other documented evidence of her difficulties in social functioning. She points to several parts of her own sworn testimony at her administrative hearing, including that her last long-lasting job as a food inspector ended because she could not

control her rage against her supervisor. (*Id.* at 46–47.) Plaintiff also testified about several subsequent jobs she had held for fewer than ten days because she "just would snap and give attitude" and argued with coworkers to the point that her supervisor had to intervene and let her go. (*Id.* at 50–51.) She stated that she does not have any friends and, in the past, has gotten into physical altercations with her brother, ex-husband, and even strangers. (*Id.* at 53.) As to her behavior in therapy sessions, Plaintiff explained that her medical records show limited outbursts because of her extra efforts to avoid alienating her healthcare providers. (*Id.* at 67–68.)

In addition to her own testimony, there are myriad references to Plaintiff's social difficulties in the administrative record. For instance, her social worker Michelle Dubil described how in April 2014, Plaintiff became irate and was "aggressively yelling" at Dubil for accidentally putting her mail in the wrong folder. (*Id.* at 663, Dkt. No. 6-13.) Dubil also observed Plaintiff actively avoiding other people in her waiting room or even waiting outside for her appointment because there were too many people there. (*Id.* at 664.) While the ALJ cited Plaintiff's 2014 medical records to show that she had a close relationship with her father and boyfriend, the same page cited by the ALJ also states that Plaintiff had no relationship with either of her siblings and had no friends or other social support. (*See id.* at 1014, Dkt. No. 6-18.) Elsewhere, one of Plaintiff's therapists included in his session notes that Plaintiff felt she "cannot trust anyone in her life, not even her boyfriend who she just became pregnant with." (*Id.* at 1208, Dkt. No. 6-21.) The ALJ did not mention those facts. Similarly, the ALJ explained that in making his finding as to Plaintiff's social limitations, he relied on a therapist's description of Plaintiff as "cooperative and engaged" during one therapy session. (*Id.* at 23, Dkt. No. 6-3.) But only a few months earlier, Plaintiff's therapist, Trager, wrote that she was making slow progress and was resistant to engaging fully in therapy. (*Id.* at 1204, Dkt. No. 6-21.)

The ALJ's decision need not mention every piece of evidence for his finding to be supported by substantial evidence. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). But he "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Id.* Here, the ALJ recited only facts that supported his conclusion that Plaintiff's limitations in social functioning were moderate. He declined to grapple with the evidence in the record suggesting that her limitations were more severe—for example, that she had no friends. *Cf. Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (finding that the ALJ was not entitled to reject a doctor's medical opinion that the claimant had marked limitations in social functioning merely because she attended doctor's appointments, went grocery shopping at night, and had two close friends).

Beyond cherry-picking certain facts, the ALJ also asserted inconsistencies in the record concerning Plaintiff's social limitations that are not supported by the record. The ALJ found that Plaintiff did not struggle with casual interactions with strangers, as demonstrated by the fact that she went grocery shopping. (Admin. R. at 23, Dkt. No. 6-3.) In support of his statement, the ALJ cited Dr. Galloucis's May 2014 evaluation, which mentioned that Plaintiff went grocery shopping with her boyfriend. (*Id.* at 894, Dkt. No. 6-16.) On the same page, however, Dr. Galloucis also wrote that Plaintiff did not go out often because she felt self-conscious and believed that everyone was watching her. (*Id.*) The ALJ dismissed Plaintiff's testimony about a particular grocery shopping trip in light of Dr. Galloucis's comment, but Plaintiff's testimony appears in fact to have been consistent with Dr. Galloucis's evaluation.

When looking to a claimant's daily activities to shed light on her symptoms, the ALJ must consider ***how*** the claimant carries out those activities.[5] *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir.

---

[5] As discussed above, a marked restriction in the activities of daily living is a listed standard under Paragraph B of § 12.04 of the relevant Appendix 1 Criteria. However, the Court raises the issue again here

2008). For instance, in *Craft*, the Seventh Circuit faulted the ALJ for relying upon the claimant's listed daily activities while ignoring that his "daily walk" was only to the mailbox at the end of his driveway; "cleaning his apartment" meant vacuuming for four minutes; and he went grocery shopping on a motorized cart, limiting himself to two bags per trip. *Id.* The Seventh Circuit instructed the ALJ to reconsider on remand the finding that the claimant's daily activities "belie[d] his assertion of incapacity." *Id.*; *see also Deathra P. v. Saul*, No. 18 C 5882, 2020 WL 553705, at *8 (N.D. Ill. Feb. 4, 2020) (reversing the ALJ's decision where the ALJ's determination of Plaintiff's credibility relied on her activities of daily living without mentioning her testimony that she had to take breaks every fifteen minutes to complete those activities). Here, that Plaintiff often went grocery shopping with her boyfriend did not contradict her story about having an outburst during a shopping trip on her own. Additionally, the ALJ relied upon a statement included in a 2014 medical evaluation, whereas Plaintiff testified in 2016. The ALJ did not consider whether Plaintiff's symptoms had worsened over time.

Overall, the Court finds that the ALJ failed to confront all the relevant evidence concerning Plaintiff's limitations in social functioning. The ALJ thus failed to "build an accurate and logical bridge" between the evidence and the conclusion as required to support his finding. *Lanigan*, 865 F.3d at 563.

### C.    Concentration, Persistence, or Pace

"Concentration, persistence, or pace" is defined as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *See* 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00(C)(3)

---

because a claimant's activities of daily living are also relevant at other steps of the social security disability determination. For instance, "[a]n ALJ can appropriately consider a claimant's daily activities when assessing h[er] alleged symptoms" at the RFC stage at Step Four. *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008).

(effective Sept. 29, 2016 to Jan. 16, 2017). The ALJ determined that Plaintiff showed only moderate difficulties in concentration, persistence, or pace. (Admin. R. at 23, Dkt. No. 6-3.)

Plaintiff argues that the ALJ failed to consider other relevant evidence that showed she had greater difficulties. But the portions of the record she cites actually appear to support the ALJ's findings. For instance, she points to a 2014 evaluation that found her attention, memory, and reasoning ability all within normal limits. (*Id.* at 895–96, Dkt. No. 6-16.) She also refers to the notes recorded upon her discharge from the hospital in January 2013, which stated that her thought process was coherent and her judgment intact. (*Id.* at 920, Dkt. No. 6-17.) Finally, she points to a 2016 evaluation in which the doctor found no evidence of impairment in attention or focus, no grandiose or paranoid thinking, and fair judgment. (*Id.* at 1124, Dkt. No. 6-20.)

In short, Plaintiff has not presented evidence that seriously challenges the ALJ's finding as to her concentration, persistence, or pace.

### D.    Episodes of Decompensation

As the Seventh Circuit has observed, an episode of decompensation is "not a self-defining phrase." *Larson*, 615 F.3d at 750. Most simply, "decompensation is a temporary increase in symptoms." *Id.* (citations omitted). "An incident—such as hospitalization or placement in a halfway house—that signals the need for a more structured psychological support system would qualify as an episode of decompensation, but so would many other scenarios." *Id.* (internal citation omitted). A period of decompensation may also be inferred from a significant alteration in medication or from other evidence, like a claimant missing weeks of work. *Id.*

The ALJ wrote a brief paragraph concluding that Plaintiff experienced only one episode of decompensation of extended duration—that is, when she was involuntarily committed in January 2013. (Admin. R. at 23, Dkt. No. 6-3.) But there are other incidents in the record, including

numerous revisions to Plaintiff's medication list, that could have constituted episodes of decompensation. (*See, e.g.*, *id.* at 1134, Dkt. No. 6-20; *id.* at 1159, 1161, 1163, 1164–67, Dkt. No. 6-21.) Because the ALJ did not explain why he disregarded such incidents in his decompensation analysis, the Court has no way of meaningfully reviewing his findings. *See Yurt*, 758 F.3d at 856–57 (advising that the ALJ's "decision must provide enough discussion for us to afford . . . meaningful judicial review and assess the validity of the agency's ultimate conclusion."). In *Yurt*, the Seventh Circuit found this type of "perfunctory conclusion" regarding episodes of decompensation inadequate. *Id.* at 861. There, the underlying decision had merely mentioned the claimant's brief hospitalizations and found that they were too short-lived to satisfy the regulations. *Id.* The Seventh Circuit remanded the case, ordering the ALJ to "consider that hospitalizations are not the only way a claimant can satisfy the decompensation requirement." *Id.* Similarly, the Court finds that the ALJ's determination as to Plaintiff's episodes of decompensation is not adequately supported by the evidence.

### E.      Final Finding as to Appendix 1 Criteria

As discussed above, to determine that Plaintiff met the relevant Appendix 1 Criteria, the ALJ needed to find that she had demonstrated at least two of the standards set forth in Paragraph B. Because the ALJ's findings with respect to two of the Paragraph B areas are not supported by substantial evidence, the Court must reverse and remand for further proceedings. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that remand to the ALJ is not required for harmless error, but that "[a]n error is harmless only if we are convinced that the ALJ would reach the same result on remand."). Plaintiff has requested that the Court reverse the ALJ's decision without remanding for further proceedings. Indeed, district courts may affirm, reverse, or modify SSA decisions with or without remanding the case, and may also remand with instructions to

19

award benefits. *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). But an award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Id.* The Court cannot make a definitive finding on that point at this time and thus will remand the case for further proceedings.

## II.    RFC Analysis

If on remand, the Commissioner determines that Plaintiff meets the Appendix 1 Criteria at Step Three, her impairments would then be deemed "'severe enough' to be presumptively disabling—that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary." *Jeske*, 955 F.3d at 588. Therefore, it is possible that the agency will not reach the Step Four RFC analysis. However, because the Court is concerned by portions of the ALJ's RFC analysis and seeks to avoid waste of judicial resources that would result if those concerns are not considered on remand, the Court next addresses the RFC finding as well.

Plaintiff asserts that in making his RFC finding, the ALJ impermissibly dismissed the opinions of the only witnesses with whom she had a relationship apart from her social security claim. Plaintiff also claims that the ALJ wrongly discounted her own testimony as not credible. The Court discusses each issue in turn.

### A.    Reliance on Medical Opinions

The ALJ explicitly gave little weight to the opinions of Plaintiff's two treating providers: therapist Brian Trager and social worker Michelle Dubil. (Admin R. at 28–29, Dkt. No. 6-3.) The ALJ emphasized that neither Trager nor Dubil were acceptable medical sources. The ALJ also pointed out that Trager's session notes described how Plaintiff had difficulty trusting and opening

up to him. With respect to Dubil, the ALJ wrote that she had only worked with Plaintiff for three months when she first offered her opinion. Finally, the ALJ found both Trager's and Dubil's opinions inconsistent with the rest of the medical evidence.

Typically, an ALJ's findings are entitled to deference when he adequately articulates why he gave certain weight to each witness's or expert's opinion. *Elder v. Astrue*, 529 F.3d 408, 413, 416 (7th Cir. 2008). With respect to a medical opinion, the ALJ must apply the six-factor checklist set forth in 20 C.F.R. § 404.1527(c). *See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Those factors include: (1) whether the source has examined the claimant; (2) the length and nature of the treatment relationship; (3) whether the medical opinion is supported by relevant evidence; (4) the consistency of the opinion with the record as a whole; (5) the source's areas of specialization; and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527(c).

Plaintiff argues that the ALJ was required to provide a persuasive reason for rejecting the opinions of her treating sources—meaning sources who had an ongoing relationship with her outside of the claims process—and failed to do so. *See* 20 C.F.R. § 404.1527(c)(2); *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015) (holding that the failure to consider facts that support a treating physician's opinion is error). Under 20 C.F.R. § 404.1527(a)(2), a treating source means an acceptable medical source. The ALJ found Trager and Dubil not to be acceptable medical sources as defined in 20 C.F.R. § 404.1502(a), and Plaintiff does not present any argument to the contrary. Generally, the regulations instruct ALJs weighing the opinions of nonmedical sources to consider the same six factors listed above, with the caveat that "not every factor for weighing opinion evidence will apply in every case." 20 C.F.R. § 404.1527(f)(1). Even so, "it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable

medical source," depending on factors like the source's examining and treatment relationship with the claimant and the consistency of their evidence with the rest of the record. 20 C.F.R. § 404.1527(c), (f)(1).

In this case, the ALJ recounted the length and nature of Trager and Dubil's respective relationships with Plaintiff. He explained that they lacked medical expertise and that he found their opinions inconsistent with the rest of the record. But the ALJ did not discuss the other applicable factors, such as Trager and Dubil's areas of specialization. And as to the ALJ's finding of inconsistency, the Court has already cautioned against "cherry-picking" pieces of evidence that support a finding of non-disability. For instance, the ALJ accepted evidence that Plaintiff went grocery shopping with her boyfriend while discounting her testimony about a problem she had grocery shopping on her own. He failed to consider that both facts could have been true. On remand, the Court advises the ALJ to reconsider whether Trager and Dubil's opinions are actually inconsistent with the full record.[6]

### B.    Credibility Finding

Finally, Plaintiff claims that the ALJ based his RFC analysis on an impermissible finding that she lacked credibility, inconsistent with the regulations as amended shortly before her administrative hearing. Plaintiff contends that by pointing out inconsistencies in her statements, "[t]he ALJ engaged in the kind of gratuitous personal attack the SSA sought to eliminate when, in March, 2016 [*sic*], it rescinded SSR 96-7p and replaced it with SSR 16-3p." (Pl.'s Mem. in Supp. of Mot. for Summ. J at 14, Dkt. No. 10.) Under SSR 16-3p, the ALJ no longer explicitly assesses

---

[6] Plaintiff also argues that the ALJ "misrepresented the therapist's opinion, stating he found no deficits." (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 13, Dkt. No. 10 (citing Admin. R. at 28, Dkt. No. 6-3).) The Court sees no such representation of Trager's notes in the ALJ's decision. The ALJ explained that Trager considered Plaintiff "'extremely restricted' in her socialization with others." (Admin. R. at 28, Dkt. No. 6-3.) The Court thus dismisses Plaintiff's concerns that the ALJ provided a misleading account of Trager's opinion.

the credibility of the claimant in making an RFC determination. Instead, they "evaluate[s] the intensity and persistence of an individual's symptoms." SSR 16-3p, 81 Fed. Reg. 14166-01, at 14167 (Mar. 16, 2016). As the Seventh Circuit has explained, "[t]he change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). But ALJs may continue to assess the credibility of claimants' assertions as to their symptoms. *Id.* While the ALJ's credibility determination is entitled to special deference, he must still consider the regulatory factors and "support credibility findings with evidence in the record." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

The amended regulations set out a two-step process for assessing the claimant's assertions as to her symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms." SSR 16-3p, 81 Fed. Reg. at 14167. Second, once the ALJ establishes that an underlying impairment could cause the individual's symptoms, the ALJ "evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*

In reviewing the ALJ's RFC determination, the Court finds that his decision followed the revised regulations set forth at SSR 16-3p. The ALJ explained the two-step process; identified Plaintiff's mental impairments; discussed the medical record at length; and determined that her "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence." (Admin. R. at 26, Dkt. No. 6-3.) While Plaintiff contends that the ALJ engaged in a personal attack on her character, he merely pointed out certain inconsistencies between her testimony and the record. As discussed above, this Court

disagrees with certain of the ALJ's findings on that point. But some inconsistencies remain, particularly concerning Plaintiff's testimony as to her job at the front desk of a hotel. On remand, the Commissioner is advised again to consider whether Plaintiff's description of her symptoms is consistent with the record in full, not only with the parts of the record that support a finding of non-disability.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment (Dkt. No. 9) is granted and the Commissioner's motion (Dkt. No. 14) is denied. This case is remanded to the Commissioner for further consideration consistent with this opinion.

ENTERED:

Dated:  July 31, 2021

_____
Andrea R. Wood
United States District Judge